UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA  :

                                            :

    **v.**                                  :                  1:21-CR-59 (RC)

                                            :

**WINSTON KELLY**              :

## NOTICE OF FILING

      Undersigned counsel, on behalf of Winston Kelly, respectfully submits the attached for filing in the docket.[1]

                                          Respectfully submitted,

                                          A.J. KRAMER
                                          FEDERAL PUBLIC DEFENDER

                                          _____/s/_____
                                          EUGENE OHM
                                          Assistant Federal Public Defender
                                          625 Indiana Ave., NW
                                          Suite 550
                                          Washington, DC  20004
                                          (202) 208-7500
                                          eugene_ohm@fd.org

---

[1] Counsel apologizes for neglecting to file periodic declarations.

# FEDERAL PUBLIC DEFENDER
### DISTRICT OF DISTRICT COLUMBIA

**625 Indiana Ave. NW.**
**Washington, DC 20004**
**(202) 208-7528**
**FAX  (202) 208-7515**

| | | |
|---|---|---|
| **FEDERAL PUBLIC DEFENDER**<br>A.J. KRAMER | **Appellate Counsel**<br>Lisa Wright<br>Rosanna Taomina<br>Sandra Roland<br>Tony Axam | **ASSISTANT FEDERAL PUBLIC DEFENDERS**<br>CARLOS VANEGAS<br>DANIELLE JAHN<br>DAVID BOS<br>MARY PETRAS<br>MICHELLE PETERSON<br>EUGENE OHM |

**May 24, 2021**

AUSA Mary Dohrmann
USAO-DC
For the District of Columbia
555 4th St NW
Washington, D.C. 20004

    Re:    *United States v. Winston Kelly*, 21-cr-59 - *Brady* and Rule 16 Requests related to the D.C. Department of Forensic Sciences

Dear Ms. Dohrmann:

    I am in receipt of a series of *Brady* disclosures you have made on April 7, 2021 relating to the Department of Forensic Sciences (DFS). Upon information and belief, these disclosures have been uniform across cases involving DFS and have not been geared toward assessing what impact recent events have on the government's evidence against Mr. Kelly. I ask that your Office now take the steps outlined below to ensure that the government's *Brady* obligations have been discharged as it relates to this specific case.

1. **Overview**

    The foregoing represents my understanding of the DFS disclosures made to date. If your understanding conflicts in any way, please notify me immediately. Otherwise, I will rely on the below summary in preparing Mr. Kelly's defense.

    It is my understanding that throughout the past year, the USAO/OAG auditors and DC-OIG investigators have been sharing materials and information, and USAO prosecutors have, at times, participated in witness interviews with investigators from the DC-OIG.  Based on representations made by the USAO, it is my understanding that the USAO/OAG audit has now concluded with the March 18, 2021 Final Audit Report ("Audit Report") but that the DC-OIG criminal investigation remains ongoing.

    Through the Audit Report and supporting documentation, Mr. Kelly has been made aware that "answer shopping," that is, having multiple examiners review evidence and reporting

a single conclusion despite conflicting results, "was not an uncommon practice at DFS."[1] According to the Audit Report, DFS staff attempted to conduct re-examinations that would evade reporting requirements by (1) omitting examiners from the chain of custody[2] and (2) selectively characterizing certain re-examinations as "informal."[3] The auditors further found that DFS management manufactured an inconclusive result in the *McLeod* case, reasoning that an inconclusive "is the safest answer" because "you can't be wrong."[4] In so doing, auditors describe how DFS suppressed exclusionary results as well as what the auditors deemed to be false positive casework errors.

Furthermore, the auditors found that DFS senior management submitted fraudulent information to ANAB about the results of its re-examination of the *McLeod* evidence and covered up the conflicting conclusions of its examiners. The auditors concluded that, **"[m]anagement has cast doubt on the reliability of the work product of the entire laboratory."** March 18, 2021 USAO/OAG Final Audit Report at 4.

Recently, the DC-OIG interviewed a witness who asserted that the systemic problems of answer-shopping, dry-labbing, and corrupt management have affected other lab units as well. On April 7, 2021, the defense received a disclosure that the problems detailed by the auditors were also present in the fingerprints unit. Specifically, this source explained that DFS recently discovered a "systemic issue" with fingerprint analysts making examination errors and managers trying to cover up these issues, including engaging in "answer shopping" for results that made this unit's problems seem smaller than they are in reality. The source also made reference to unspecified problems in DFS's DNA unit.

On April 2, 2021, following the issuance of the Audit Report and disclosure of selected DC-OIG investigative memos, ANAB suspended the accreditation for the following units:

- Forensic Biology Unit
- Digital Evidence Unit
- Firearms Evidence Unit
- Latent Fingerprint Unit
- Forensic Chemistry Unit

---

[1] March 9, 2021 DC-OIG MOI- Jonathan Fried

[2] March 18, 2021 USAO/OAG Final Audit Report; February 12, 2021 DC-OIG MOI- Cody Elder.

[3] December 1, 2020 DC-OIG MOI- Jonathan Fried; February 12, 2021 DC-OIG MOI- Cody Elder.

[4] January 27, 2021 DC-OIG MOI- Elizabeth Bustamante; *see also* December 23, 2020 DC-OIG MOI- Confidential Source 2 ("Due to the politics with the USAO and the high stakes of the homicide cases involved, choosing inconclusive was a way not to commit to a specific outcome."); March 9, 2021 DC-OIG MOI Jonathan Fried (Pope and Arendse both stated "Why put ourselves our there, if inconclusive is an appropriate answer.").

In its letter to DFS, ANAB stated it had received credible evidence that **DFS deliberately concealed information from ANAB**, **violated accreditation requirements**, **engaged in misrepresentation and fraudulent behavior**, and engaged in conduct that brought ANAB into disrepute. ANAB explained that, under these circumstances, "suspension is a temporary measure pending formal withdrawal" and "[w]ithdrawal of the laboratory's accreditation will become effective thirty calendar days from the date of this letter."

In its original April 2020 directive to its auditors, your office made detailed reference to its belief that DFS purposefully hid *Brady* and *Giglio* information about witnesses the government sponsors. Most recently, as prosecutors in the *McLeod* case collaborated with the DC-OIG in its criminal investigation, they learned that DFS did not produce all documents responsive to the government subpoena in that case. The government is therefore on notice that it must take affirmative, proactive measures to ensure its obligations are met in this case.

2. **USAO/OAG 2020-2021 Audit of DFS**

**2a.** In addition to the reports and exhibits already disclosed, please provide:
- Any and all written communications, including but not limited to emails and texts, between the audit team and the government regarding the audit. These include, but are not limited to communications regarding:
    - The USAO's directive to the audit team;
    - Any documents provided to the audit team;
    - The changing scope of the audit[5];
    - Discussion regarding the substance of the audit;
    - Any drafts of the audit report;
    - Any notes, recordings, or other form of documentation of the investigation.

**2b**. In the USAO's April 6, 2020 Directive to its auditors, the government notes:

"When our Office first placed the crime scene technician [who was the subject of acrimony between the agencies] on the Lewis list, Dr. Smith instructed Raj and the Crime Scene Unit Chief to assign the employee to homicide crime scenes in an effort to force our Office to sponsor the DFS employee. Alarmed by Dr. Smith's directive, Raj notified our Office and sought assistance from the Mayor's then Counsel Mark Tuohey." USAO April 6, 2020 Directive at 2.

---

[5] Initially, the USAO directed the audit team to investigate DFS's *Brady/Giglio* practices and quality assurance systems, in addition to DFS's re-examination of the *McLeod* evidence. April 23, 2020 Joint USAO/OAG Letter to DFS at 2. However, the audit reports did not address the lab's compliance with the government's constitutional obligations. PDS objected to USAO-hired forensic practitioners unilaterally assessing the DFS's compliance with *Brady*. June 15, 2020 PDS Letter to USAO at 3. The USAO never responded to any of PDS's institutional inquiries. Thus, the formal scope of the USAO audit remains unclear.

The government has not disclosed the source of this information, further details about the re-assignment claim, or any underlying source documentation despite several disclosures regarding the government's own criminal investigation of DFS, its audit of DFS, and the DC-OIG investigations into DFS. In light of this, please provide any and all information, including witness statements, written communication (emails, texts, memoranda, and any other writings) as well as source documentation regarding this allegation. Please identify the Crime Scene Unit Chief and disclose whether this manager complied with Dr. Smith's directive to assign the crime scene technician to homicide scenes.

### 3. DC-OIG Investigations

**3a.** The government has disclosed selected interview memoranda and emails gathered by the DC-OIG. In addition to these selected materials, please provide:
- Source documentation for each interview memorandum disclosed, including:
    o Any and all audio and/or video recording;
    o Any and all investigative notes;
    o Any and all written communications between the witness and government agents;
    o Any and all materials provided by the witness to government agents;
    o Any and all investigative materials following up on information provided by the witness
- Additional interview memoranda and associated source documentation for other witnesses interviewed by the DC-OIG

**3b.** DC-OIG memoranda state that it is investigating allegations that Director Jenifer Smith and General Counsel Todd Smith pressured analysts to change their answers after examining the *McLeod* evidence. Please provide the source of the allegation that this pressure originated from Dr. Smith and Mr. Smith. Please provide any and all evidence in the government's possession to support the allegation.

**3c.** In his March 9, 2021 interview with the DC-OIG, Jonathan Fried indicated that he recently became aware of a 2016 quality issue where the FEU issued multiple reports on the same set of ballistic evidence but reported out conflicting conclusions. Specifically, Fried stated that there were four reports issued: three reports stated "identification" conclusions and the fourth report stated an "elimination" conclusion. Fried was told that when the USAO confronted DFS about these conflicting results, DFS revised all four reports and changed all conclusions to "inconclusive." According to Fried, he was told that "inconclusive" was reported without any a evidence re-examination taking place. In light of this information, please take the following steps:

- Identify the effected cases by defendant name and docket number;
- Confirm whether the USAO was aware of these conflicting examination results in 2016;
- Confirm whether the USAO confronted DFS about the conflicting results;
- Disclose what steps, if any, the USAO took in response to these conflicting reports and subsequently re-issued "inconclusive" reports;

- Provide the ballistics case files, underlying source documentation, and communications between the USAO and DFS, including but not limited to emails, texts, letters, and memoranda.

**3d.** Finally, the government has indicated that DC-OIG initiated an administrative investigation into DFS following the January 2020 USAO Fraud and Public Corruption Report. The government has further indicated that after it provided the DC-OIG with materials produced by DFS pursuant to the *McLeod* subpoena, DC-OIG began a criminal investigation. Please provide information about the status of DC-OIG's administrative investigation, whether it has closed, and what findings, if any, were reached.

4. **Inquiry into DFS's work product (answer-shopping, suppressing conflicting conclusions)**

**4a.** In light of the facts outlined in Section 1, Mr. Kelly makes the following specific requests:

- Confirm in writing with every DFS analyst who performed testing in this case:
    - whether that examiner engages in the practice of leaving evidence with colleagues for "informal review" without documenting that evidence transfer in the chain of custody or in the examiner's report of examination;
    - whether the evidence in this case was "shopped" around in any capacity, under the guise of consultation, consensus-building, or any other term used for "answer-shopping";
    - the names of all DFS staff who reviewed evidence in this case, including any "informal" review or consultation;
    - any and all information reported during any "informal" review or consultation.

- Produce all emails and other written communications from DFS that relate to the evidence in this case.[6]

- Given the reference in the March 31, 2021 DC-OIG MOI (Confidential Source 3) to a recent internal audit of the Latent Fingerprint Unit yielding disturbing results, please provide confirm whether DFS has conducted other internal audits of units housed within the Consolidated Forensic Laboratory, the Crime Scene Sciences Division, as well as the Forensic Chemistry Unit housed within the Public Health Laboratory. Please provide full source documentation associated with any recent internal DFS audits.

- Produce copies of the USAO's recent complaints to ANAB regarding DFS's casework, quality assurance, and oversight systems, as well as any additional documentation setting out the basis for those recent complaints. To the extent ANAB provided the USAO with materials responsive to the complaints, please provide these as well.

---

[6] The auditors detail how evidence of answer shopping and corresponding gaps in the chain of custody were revealed through informal email communications between examiners and unit supervisors.

5. **Chain of Custody Requests and LIMS Audit in Light of Chain of Custody and Dry-Labbing Concerns**

It has come to our attention that substantial chain of custody discrepancies exist between the DFS LIMS system, DFS's back-up paper chain of custody system, and the MPD File on Q/Evidence on Q system. DFS employees routinely disregard the need to maintain a chain of custody when they engage in "answer-shopping" and give physical evidence to other examiners for review. Evidence gathered by the DC-OIG indicates that this practice is widespread.[7]

Further, both the USAO/OAG Audit Report and the earlier FPC Report confirm multiple instances of dry-labbing by DFS, i.e. examiners reporting out results and conclusions without conducting an examination.[8]

**5a.** In light of the above, please take the following action:
- provide complete chain of custody documentation as it is reflected in (1) LIMS; (2) DFS paper chain of custody; (3) MPD File on Q/ Evidence on Q;
- confirm in writing with each reporting examiner whether evidence was ever out of their immediate physical possession during the periods where LIMS lists the evidence in that examiner's possession;
- confirm in writing with the reporting analyst in each unit whether the COC accurately reflects the location of the evidence to their knowledge;
- any and all training manuals that relate to packaging, maintaining and tracking evidence for the Crime Scene Sciences division, as well as each forensic analysis unit that had custody over the evidence;
- DFS unit visitor logs for the time when the evidence was in the possession of DFS;
- provide all LIMS audit trails and any other LIMS meta-data related to this case, including but not limited to audit trials related to the following:
    - chain of custody
    - verification for each examination conducted
    - administrative review for each examination conducted
    - technical review for each examination conducted
    - examination report date
    - FEU generic barcode
    - LIMS request for analysis
    - Helpdesk tickets
    - Any files uploaded in LIMS through case images

6. **DFS Employee Discipline and Quality Assurance Data**

---

[7] March 9, 2021 DC-OIG MOI- Jonathan Fried; March 9, 2021 DC-OIG MOI- Ashley Rachael.

[8] Audit Report at 3 (Mulderig reporting "inconclusive" without examining or reevaluating evidence); FPC report at 26-27 (Pope completing administrative and technical review for missing casefiles).

**6a.** In light of the ongoing problems related to the production of *Brady* and *Giglio* evidence at DFS, and the corresponding need for the defense to investigate this evidence well in advance of trial, please disclose the following for (1) all testifying witnesses; (2) all employees who appear in the chain of custody for any physical evidence; and (3) all other employees the government learns were involved in this case, even in an "informal" capacity:

- Official reprimands, including source documents such as:
    - Proposing official's rationale worksheet, which sets out the alleged misconduct, any aggravating/mitigating factors, and reflects the DFS equivalent to MPD's system of graduated discipline by explicitly listing past disciplinary history as an aggravating or mitigating factor.
    - Any and all written employee response(s)
    - Any and all written witness response(s)
    - Any and all audio files of witness and/or employee interviews
    - Any and all proposed disciplinary action(s)
    - Final agency decisions upholding or declining to impose findings and discipline set out in rationale worksheet

- Performance improvement plans, including letters of counseling, and/or letters of direction issued by management in response to poor performance.

**6b.** The defense further requests:
- **All Quality Corrective Action Reports (QCARs)** that fall into the following 3 categories:
    - Relate directly to the work performed in this case
    - Involve employees involved in the handling, processing, or testing of evidence in this case, or
    - Involve overall forensic unit quality issues that could have affected the evidence in this case.
        - For each type of QCAR request, the defense specifically request the full reports (including Parts A-D as well as supporting documentation). We also request all information pertaining to recommendations made by the SAB on how to resolve such QCARs, including but not limited to all notes, reports, memoranda and PowerPoint slides; all information pertaining to whether or not DFS accepted or rejected any such SAB recommendation, including but not limited to all notes, reports, memoranda and PowerPoint slides; and all information relating to the reason(s) why DFS accepted or rejected any such SAB recommendation, including but not limited to all notes, reports, memoranda and PowerPoint slides.
- **All Quality Preventative Action Reports (QPARs)** that fall into the following 3 categories:
    - Relate directly to the work performed in this case
    - Involve employees involved in the handling, processing, or testing of evidence in this case, or

- o Involve overall forensic unit quality issues that could have affected the evidence in this case.
- o For each type of QPAR request, the defense specifically requests all reports, interview memoranda, as well as underlying documents and associated responses.
- **DFS Nonconformity Tracker Entries**[9] that fall into any of the following 3 categories:
    - o Relate directly to the work performed in this case
    - o Involve employees involved in the handling, processing, or testing of evidence in this case, or
    - o Involve overall forensic unit quality issues that could have affected the evidence in this case.
- **Protocols, SOPs, and/or other guidance issued by DFS regarding the non-conformity tracker** that provide guidance on how to determine whether non-conforming work should be documented using the non-conformity tracker or Quality Corrective Action Report, or in some other manner. Similarly, please provide any guidance issued by DFS setting forth situations where non-conformities are not documented by any means.

7. **Identify the actors involved in already-disclosed QCARs**

**7a.** I am in receipt of over 2,500 pages of QCARs categorized by year of issuance. **These documents fail to specify the identity of the employee to which each report relates**. Please provide this identifying information. Without this information, this voluminous disclosure is incomplete and not usable. To discharge its constitutional obligations, the defense must be given *Brady* information in a format that is "sufficiently specific and complete." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). "*Brady* does not authorize the government to engage in a game of hide-and-seek, or require the defense to 'scavenge for hints of undisclosed *Brady* material.'" *Vaughn*, 93 A3d 1237,1256 (D.C. 2014) (citing *Miller v. United States*, 14 A.3d 1094, 1113 (D.C. 2011) (internal quotations omitted)). Without identifying the staff-person involved, it is impossible to determine how a particular QCAR may relate to the reliability of the government's evidence or the preparation of Mr. Kelly's defense.

**7b.** Please investigate and provide any information that DFS management or others at DFS attempted to remove names from QCAR, QPAR, or non-conformity documentation. This requests covers efforts to go back and remove names from previously completed QCARs, QPARs, and non-conformity reports, as well as suggestions, efforts, or policy/practice type changes to remove names from these documents as they are created going forward. Seeking to prevent the discovery of names associated with these documents demonstrates an effort by DFS

---

[9] By "nonconformity tracker," counsel refers to all documents, materials and information contained in DFS's log used for tracking non-conforming work. See, e.g., FSL Quality Assurance Manual at 4.11.1 ("The documentation of the nonconforming work . . . will consist of an entry to the nonconformity tracker or a Quality Corrective Action Report will be initiated."). Note that it is our understanding that the nonconformity tracker captures a larger universe of nonconformities than ultimately are processed as QCARs or QPARs; please do not assume that providing QCARs/QPARs relieves the government of its obligation to provide information contained exclusively in the tracker.

to "thwart the ascertainment of the truth in a judicial proceeding" and is corruption bias. *Longus v. United States*, 52 A.3d 836, 852 (D.C. 2012)

**8. Conclusion**

While I have outlined the above detailed requests and the bases for those requests, I urge you to not confine your *Brady* review to the requests above, but instead to conduct a comprehensive review that extends beyond the file in this case to all information within the possession of the prosecution team as it relates to systemic dysfunction and corruption at DFS, the failure of quality assurance and oversight systems in place for the DFS units implicated in this case, as well as any other exculpatory and/or impeachment information within the government's possession.

To ensure that Mr. Kelly's trial is not delayed, the defense requests that the government provide the requested materials as soon as possible. Any delay resulting from the government's failure to provide this *Brady* material promptly will be weighed heavily against the government. *See Vermont v. Brillon*, 556 U.S. 81, 90 (2009) ("Deliberate delay to hamper the defense weighs heavily against the prosecution.").

Please do not hesitate to reach out if you have any questions or concerns about any of the above requests.

Best.

Eugene Ohm
Attorney for Winston Kelly